CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

5/21/2022

JULIA C. DUDLEY, CLERK
BY: s/ C. Amos
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

UNITED STATES OF AMERICA,

                *Plaintiff*,

      v.

ENVIGO RMS, LLC,

                *Defendant*.

Case No.: 6:22-cv-00028

**<u>AMENDED</u>**
**<u>TEMPORARY RESTRAINING ORDER</u>**
**<u>(ISSUED EX PARTE)</u>**

Judge Norman K. Moon

On May 19, 2022, the United States of America filed a complaint and motion requesting an *ex parte* temporary restraining order directed against Envigo, a company that breeds and sells animals for use in scientific research. Envigo's facility in Cumberland, Virginia, raises thousands of beagles for these purposes at any given time. This Court now concludes that the Government has provided sufficient evidence that Envigo is engaged in serious and ongoing violations of the Animal Welfare Act, and that an immediate temporary restraining order must issue to put a halt to such violations pending further proceedings.

Over 300 beagle puppies have died onsite due to "unknown causes" over seven months. Many were not given anesthesia before they were euthanized by intracardiac injection. Beagles with even minor injuries or easily treated medical conditions were euthanized rather than given veterinary care. Nursing female beagles were denied food, and so they (and their litters) were unable to get adequate nutrition. The food that the beagles did receive was observed to contain live insects, worms, maggots, beetles, flies, ants, mold, and feces.

1

Beagle puppies remained housed in their enclosures as they were hosed down with cold water, leaving them shivering. Over an eight-week period, 25 beagle puppies died from cold exposure. The enclosures were overcrowded. The facility was understaffed. Inspectors found over 900 beagle and beagle puppy records to be incomplete or inaccurate. The list of serious violations of the Animal Welfare Act and its regulations goes on and on. Indeed, pursuant to federal search warrant executed days ago (May 18, 2022), law enforcement has seized 145 dogs and puppies from the facility that veterinarians determined needed immediate care to alleviate life-threatening illnesses or injuries.

The Government has demonstrated that extraordinary relief in the form of an *ex parte* temporary restraining order is warranted to put an immediate halt to such practices. Defendants will have the opportunity to plead their case on an expedited basis.

## Background

Congress enacted the Animal Welfare Act ("AWA"), in part, "to insure that animals intended for use in research facilities … are provided humane care and treatment." 7 U.S.C. § 2131(1); *People for the Ethical Treatment of Animals v. U.S. Dep't of Ag.*, 861 F.3d 502, 508 (4th Cir. 2017) ("Congress passed the AWA in 1966 to regulate the research, exhibition, and sale of animals, as well as to assure their humane treatment.").

The AWA authorizes the Secretary of Agriculture to "promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the AWA]." 7 U.S.C. §§ 2132(b), 2151. The Secretary has promulgated many such regulations under the AWA. *See* 9 C.F.R. § 1.1–3.142. The AWA and its regulations "set forth minimum requirements for the treatment of animals by dealers, research facilities, and exhibitors, including how animals are to be handled, housed, fed, transported, and provided veterinary care." *United States v. Lowe*, No.

20-cv-0423, 2021 WL 149838 at *11 (E.D. Okla. Jan. 15, 2021) (citing 7 U.S.C. § 2143(a)(1)-(a)(2)(A); 9 C.F.R. § 3.1-.142).

Envigo RMS, LLC operates a facility in Cumberland, Virginia where it deals in beagles intended for use at research facilities.[1] Dkt. 1 ("Compl.") ¶ 3. Up to 5,000 beagles have been housed at this facility since July 2021. *Id.* In 2019, the United States Department of Agriculture ("USDA") issued Envigo a "Class A" license under the AWA to breed and sell dogs (AWA license 32-A-0774). *Id.* ¶¶ 3, 48; Dkt. 2-1 p. 3.

Between July 2021 and March 2022, USDA's Animal and Plant Health Inspection Service ("APHIS") conducted five inspections of Envigo's Cumberland facility—documenting over 60 citations for Envigo's failing to comply with the AWA and its regulations, and over half of those were "critical" or "direct" violations, which are the most serious type of violation. *See* Compl. ¶¶ 4, 50–54; Dkts. 2-2 – 2.6.[2] On May 18, 2022, USDA agents and other law enforcement officers executed a federal search warrant at the Cumberland facility, seizing 145 dogs and puppies that were determined to be in "acute distress" and needing immediate veterinary care to alleviate life-threatening illnesses or injuries. Compl. ¶ 55; Dkt. 2-8 ¶ 8 ("Moffett Decl."); Dkt. 2-9 ¶ 6 ("Hollingsworth Decl.").

On May 19, 2022, the Government filed this federal lawsuit against Envigo, alleging six violations of the Animal Welfare Act and its implementing regulations. *See* Compl. Later that

---

[1] In November 2021, Inotiv, Inc., announced it had acquired Envigo, but the site still operates under Envigo's AWA license. Compl. ¶ 52.

[2] These include a "routine inspection" and a separate "focused inspection" conducted in July 2021 (Dkts. 2-2, 2-3), a focused inspection conducted in October 2021 (Dkt. 2-4), a routine inspection conducted in November 2021 (Dkt. 2-5), and another focused inspection conducted in March 2022 (Dkt. 2-6).

day the Government also filed an *ex parte* motion and brief requesting that the Court issue a temporary restraining order against Envigo. *See* Dkts. 2, 2-1.

**Standard of Review**

The AWA provides that "[t]he United States district courts . . . are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of" the AWA. 7 U.S.C. § 2146(c).[3] Rule 65 of the Federal Rules of Civil Procedure provides that "[t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if" two conditions are met. Fed. R. Civ. P. 65(b)(1). First, the movant must provide "specific facts in an affidavit or a verified complaint [that] clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). Second, the movant's attorney must "certify in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1)(B).

A temporary restraining order "is intended to preserve the status quo only until a preliminary injunction hearing can be held." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999); *see also Granny Goose Foods, Inc. v. B'hood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974) (explaining that ex parte temporary restraining orders under federal law "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer").

---

[3] The Court's previous version of this order cited to 7 U.S.C. § 2159, which is not applicable here, rather than 7 U.S.C. § 2146(c). *See* Dkt. 3. Regardless, because the Court's decision to grant this TRO was based on its inherent equitable powers, and the AWA merely clarifies that federal district courts retain the power to enforce its provisions, the Court's analysis remains the same.

As with a plaintiff seeking a preliminary injunction, a plaintiff seeking a temporary restraining order[4] must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that the injunction is in the public interest." *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Moreover, "*Winter* made clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief." *Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018). Such relief constitutes an "extraordinary remedy" that is never awarded as of right. *See Winter*, 555 U.S. at 24.

**Likelihood of Success on the Merits**

1. <u>Failure to Provide Adequate Veterinary Care</u>

The Government contends that Envigo has consistently failed, despite repeated warnings and opportunities for correction, to meet its obligations under AWA's implementing regulations to provide adequate veterinary care. *See* Dkt. 2-1 pp. 10–11. Based on the overwhelming evidence produced by the Government, the Court agrees.

The AWA has authorized the Secretary of Agriculture to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors," which include the "minimum requirements" for "adequate veterinary care," among other things. 7 U.S.C. § 2143(a)(1)-(2)(A); *see also* 9 C.F.R. § 3.13 ("Veterinary care for dogs"); 9 C.F.R. § 2.40 ("Attending veterinarian and adequate veterinary care").

Programs of "adequate veterinary care" require "[d]aily observations of all animals to assess their health and well-being." 9 C.F.R. § 2.40(b)(3). While that "daily observation" need

---

[4] "The standard for granting either a TRO or preliminary injunction is the same." *Toure v. Hott*, 458 F. Supp. 3d 387, 396 (E.D. Va. 2020) (quoting *Sansour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017)).

not always be conducted by a licensed veterinarian, "a mechanism of direct and frequent communication is required so that timely and accurate information on problems of animal health, behavior, and well-being is conveyed to the attending veterinarian." *Id.*[5] The regulations also require that medical observation be followed-up with "an appropriate program of veterinary care for dogs that is developed, documented in writing, and signed by the attending veterinarian." 9 C.F.R. § 3.13(a). The program must include a yearly physical examination by a veterinarian, vaccinations, treatment for parasites, and other preventative care; including "treatment to ensure healthy and unmatted hair coats, properly trimmed nails, and clean and healthy eyes, ears, skin, and teeth." *Id*. The program of medical care must be appropriate to "prevent, control, diagnose, and treat diseases and injuries." 9 C.F.R. § 2.40(b)(2). The Government has put forward evidence clearly showing that Envigo regularly failed, and continues to fail, to abide by those requirements; resulting in lasting and deteriorating serious health conditions that could have been rectified if observed and treated in a timely manner.

For instance, in July 2021, inspectors identified 15 beagles with medical problems that were not previously observed or treated by Envigo, including beagles that had eye and ear conditions, skin infections, wounds and lesions, and severe dental disease. Compl. ¶ 65; Dkt. 2-2 pp. 1–5. One beagle was found with "patchy hair loss" covering over 70% of her body and yellow scabs. Dkt. 2-2 p. 2.

During the November 2021 inspection, inspectors identified 30 beagles with severe dental disease that had not been treated despite having been observed by Envigo staff. Compl. ¶ 57; Dkt. 2-5 p. 2. One nursing female was clearly emaciated. Dkt. 2-5 p. 2. Records showed

---

[5] Indeed, the regulations require "the availability of emergency, weekend, and holiday care." 9 C.F.R. § 2.40(b)(3).

that she had been underweight for three months, yet she had not received any medical attention. *Id*. Seven beagles had foot conditions, one beagle had an ear infection, and another had large patches of hair loss along its entire back. Dkt. 2-5 pp. 2–3. The inspectors found another 34 beagles with medical conditions that had not been previously observed or treated by Envigo, including: seven beagles with severe dental disease; three beagles with weakness or lethargy; eight beagles and beagle puppies with traumatic wounds "to the legs, chest, abdomen, neck, ears and tails," many of which appeared to have dried blood matting fur; eight beagles with lameness or foot medical conditions; six with eye conditions; two with ear conditions; three with skin conditions; and two with masses, including a beagle puppy with a "large, soft, fluid filled, swelling on the top of his head." Dkt. 2-5 p. 3–4. Medical records also indicated several instances of beagles that had died from some ailment which would ordinarily be preceded by significant clinical signs—yet records did not indicate that any such observations were made. Compl. ¶¶ 69–70; *e.g.*, Dkt. 2-5 p. 4 (necropsy for beagle stated she was diagnosed with a ruptured uterus, with no records of prior symptoms). To be clear, these are but a few examples of the many failures in veterinary care documented in the APHIS inspections before the Court. *See also* Dkts. 2-2 – 2-6.

Envigo's level of veterinary care for its beagles has not improved since those earlier inspections. Veterinary exams ensuing from the May 18, 2022, search warrant determined that 145 beagles were in "acute distress," meaning that the beagles required "immediate veterinary treatment or other care to promptly alleviate a life-threatening illness/injury or any suffering." Moffitt Decl. ¶ 8. The Court understands this number is likely to grow as the Government's veterinarians continue to examine dogs throughout the weekend. Dkt. 2-1 p. 6. Even those beagles not currently in "acute distress" are suffering from significant and serious health

conditions, including wounds that required wound care and antibiotics or anti-inflammatory medications,[6] or swollen or enflamed paws,[7] or had dental disease,[8] or other health issues.[9]

Many beagles and beagle puppies did not make it that far. Mortality records indicate that over 300 beagle puppies died between January and July of last year as a result of "unknown causes." Dkt. 2-3 p. 1. Over 150 beagle puppies under 5 weeks of age, and 16 adult beagles, were found dead and medical records indicated their corpses had already begun to decompose and so no other cause of death could be identified. *Id.* 2.[10] Despite these harrowing statistics, Envigo's attending veterinarian apparently does not require Envigo staff to notify her when a puppy is found dead. Compl. ¶ 72; Dkt. 2-3 p.1. The Government maintains, and the Court agrees, that such a policy is inconsistent with Envigo's obligation to utilize methods appropriate to the prevention of disease and injury. *See* Compl. ¶ 72. Those medical records which are present (even if incomplete) and other evidence submitted further demonstrate that Envigo was failing to attend to beagles' wellbeing or provide them adequate veterinary care with respect to any injuries, illnesses, or serious health conditions which caused the deaths of these particular beagles and beagle puppies and further suggest Envigo's failure to make efforts to learn from these (hundreds) of premature deaths to ensure other litters' health and safety.

---

[6] *See, e.g.*, Dkt. 2-11 (veterinary records) ECF pp. 2, 3, 4, 6 (diagnosed with puncture wounds, scarring, "missing quarter sized part of ear"), 66. Other beagles suffered from reducible umbilical hernias requiring surgical correction. *Id.* 8, 37, 59, 60.

[7] *See, e.g.*, Dkt. 2-11 ECF pp. 9, 10, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, *et seq.*

[8] *See, e.g.*, Dkt. 2-11 ECF pp. 5, 8, 18, 22, 24, 25, 27, 74, 75, 76.

[9] *See, e.g.*, Dkt. 2-11 ECF pp. 73 (abscess on head), 79 ("fecal impaction on all four feet, painful dental disease"), 47 ( "very thin," recommending "monitor, improve nutrition"), 55 ("very distended abdomen," and recommending de-wormer), 56, 58, 61 (same).

[10] For instance, more recent medical records detail one particularly grisly, current similar instance. Dkt. 2-7 (necropsy report, reading: "unknown – pup eat[e]n – only has a head left").

The Government has alleged that Envigo instead used non-veterinarian employees both to provide medical care and to euthanize beagles. Compl. ¶¶ 60–61. Perhaps the most heinous discovery of the November 2021 inspection was that Envigo had allowed staff to euthanize dogs without anesthesia, in violation of the facility's own program of care. *Id.* ¶ 62; Dkt. 2-5 p. 1 ("Inspectors reviewed 171 medical records documenting euthanasia of 196 dogs and puppies and found that many young puppies are not receiving anesthesia prior to being euthanized via intracardiac injection as required by the SOP."). The October 2021 inspection similarly showed that medical care, including medication for serious ailments, was provided by non-veterinary staff, even though this was a violation of Envigo's program of medical care. Compl. ¶ 63; Dkt. 2-4 p. 1. Records also showed that many beagles did not receive their annual physical at all. Dkt. 2-5 pp. 20.

Based on the foregoing evidence, the Court concludes that the Government is likely to succeed on the merits by showing that Envigo has failed to provide beagles at its Cumberland facility with adequate veterinary care, in violation of 9 C.F.R. §§ 3.13, 2.40, among others.

2. Failure to Provide Uncontaminated, Wholesome, Palatable Food of Sufficient Quantity and Nutritive Value and to Make Potable Water Continuously Available

The Government's evidence also displays a disturbing failure by Envigo to meet its obligation to provide each beagle with clean, palatable food of adequate quantity and nutritive value. *See* Dkt. 2-1 pp. 11–12.

A. *Food and Water Quality*

Minimum standards of nourishment are established by 9 C.F.R. § 3.9, which provides, in relevant part, that dogs must be fed, "at least once each day," "uncontaminated, wholesome, palatable" food that is of "sufficient quantity and nutritive value." *Id.* § 3.9(a). It also provides that food receptacles must be "located so as to minimize contamination by excreta and pests." *Id.*

§ 3.9(b). Water must be potable and water receptacles must be kept clean and sanitized according to prescribed standards. *Id.* § 3.10(a) & (c).

The July 2021 inspectors discovered that nursing females were being denied food for 42-hour periods—apparently in an effort to reduce milk production. Dkt. 2-2 p. 6. In lieu of the daily feeding required by § 3.9(a), food receptacles were placed in front of the mothers' enclosures, so that they could see and smell the food but not eat it. *Id.* 7. *See also id.* ("Three dams were observed to be reaching their front paws through the doors of the cages to reach the food in the top of their feeders, these dogs were seen trying to scoop or dig out food from the feeders but could only retrieve the occasional piece of kibble."). The reduced milk production resulting from this practice almost certainly meant that nursing puppies were not having their nutritional needs met either. *See* Compl. ¶¶ 80–81.

When food was provided, it clearly fell short of the "uncontaminated, wholesome, [and] palatable" requirement. The July 2021 investigation found that the beagles' food contained live insects. Dkt. 2-3 pp. 11–12. *See also id.* 11 (recording inspectors' observation of ants "going in and out of self feeders").

Envigo fared no better in the November 2021 inspection. Taking random samples of food contained in receptacles in two rooms, inspectors found in each instance that food was "wet, caked, and/or moldy." Dkt. 2-5 p. 15. Two receptacles also contained "large numbers of maggots." *Id.* Envigo was again directed to correct the issue. *Id.* Inspectors also noted that food receptacles were mounted in such a way that back-splashed water containing feces was mixed into the beagles' food when staff pressure washed the enclosures. *Id.* 16.

In March 2022, inspectors again found that "self-feeders at the facility are not being cleaned adequately and do not prevent molding, deterioration, and caking of feed." Dkt. 2-6 p. 6.

B. *Food and Water Access*

Respecting access to food and water, the regulations provide that water must be continually available, 9 C.F.R. § 3.10(a), and that a dog's food must be "readily accessible," *id.* § 3.9(b).

The July 2021 inspection nevertheless revealed that Envigo failed to make food receptacles available to all of the dogs in its facility. Dkt. 2-5 pp. 15–16. Between four to eleven animals were forced to share a single receptacle, which could be accessed by only one dog at a time. *Id*. 16. Despite being instructed to correct the issue, *id.*, Government officials observed the same problem when executing the search warrant on May 18. Dkt. 2-10 ¶ 21 ("Taylor Decl."). One investigator observed that each receptacle contained the same food, regardless of whether the enclosure housed adult dogs, nursing mothers, or young puppies. *Id*. ¶ 20. *See also* Moffitt Decl. ¶ 9 (noting that puppies and younger dogs have "food needs that are different from the food needs of adult dogs"). The inspector also observed that many beagles, including puppies, could not access water spigots. Taylor Decl. ¶ 18.

Based on the foregoing evidence, the Court concludes that the Government is likely to succeed on the merits by showing that Envigo has failed to provide beagles at its Cumberland facility the minimum standards for nourishment, in violation of 9 C.F.R. § 3.9, and continually available water and readily accessible food, in violation of § 3.9 and § 3.10(a).

3. Failure to Maintain Minimum Handling & Housing Standards to Keep Dogs Safe

The Government contends that Envigo is failing to meet the minimum standards for handling and housing the beagles in violation of the AWA, resulting in their suffering and death. Dkt. 2-1 p. 12. AWA regulations require that all animals be handled "as expeditiously and carefully as possible in a manner that does not cause trauma, overheating, excessive cooling,

behavioral stress, physical harm, or unnecessary discomfort." 9 C.F.R. § 2.131(b)(1). "Physical abuse" and "deprivation of food or water" cannot be used to "train, work, or otherwise handle animals." *Id.* § 2.131(b)(2)(i)-(ii). Any "short-term withholding of food or water" is only allowed "as long as each of the animals affected receives its full dietary and nutrition requirements each day." *Id.* § 2.131(b)(2)(ii). Moreover, dogs that are "housed in the same primary enclosure must be compatible," and "[a]ny dog … exhibiting a vicious or overly aggressive disposition must be housed separately[.]" 9 C.F.R. § 3.7.

The Government alleges and has offered evidence in support of the following facts. Due to overcrowding and incompatibility between dogs housed together, and due to inadequate protection from Envigo, beagles at the Cumberland facility have repeatedly injured one another and suffered injury, disease, and death due to exposure to the environment. Dkt. 2-1 p. 12. Records show that 48 beagles at the facility were found with fight wounds between January and July 2021, and that three dogs died from fight wounds. Dkt. 2-3 p. 8. APHIS inspectors instructed Envigo to ensure that there was a mechanism in place to protect the dogs from one another, but when inspectors returned to the facility in October 2021, they found more dogs with serious fight injuries. Dkt. 2-4 p. 9. Envigo staff had failed to notice the fight wounds. *Id.* Also in October 2021, a female beagle was found dead with evidence that her littermates had chewed on her; the mortality log attributed her death to evisceration. *Id.* p. 10. When APHIS investigators asked to talk to the employee who found the dead dog, they were told that the employee was unavailable. *Id.*

During a November 2021 inspection, APHIS inspectors noted continued aggression between the dogs, and the inspection had to be repeatedly stopped temporarily for fighting

beagles to be separated. Dkt. 2-5 p. 14. Inspectors observed more of the same in March 2022. *See* Dkt. 2-6.

In addition to compatibility issues, APHIS inspectors found that Envigo had failed to provide the minimum amount of space needed to house 742 beagles and weaned puppies. *See* Dkt. 2-5 pp. 13–14. Inspectors observed beagles fighting over limited food. *Id.* pp. 15–16.

The records also show that Envigo has failed to keep beagle puppies safe by allowing them to become wet when Envigo staff hosed down their enclosures with water. *Id.* p. 7. In November 2021, inspectors found 21 puppies damp and shivering in building G3. *Id.* Three days later, inspectors found additional damp and cold puppies in building G3. *Id.* Envigo records show that in the eight weeks before the November 2021 inspection, 25 puppies had been found dead in building G3 with a cause of death attributable to cold exposure. *Id.*

The Government offers additional evidence arising from the execution of the search warrant in May 2022. Federal investigators observed "widespread fighting" between beagles sharing food sources in the same cages. Taylor Decl. ¶¶ 15–16. Investigators also observed beagles fighting between adjacent cages; they observed "beagles stand[ing] on their hind legs to physically attack beagles located in adjacent enclosures through openings in the partition between the enclosures." *Id.* ¶ 16. Investigators noted inadequate partitions between the enclosures to prevent such fighting. *Id.*

Based on the foregoing evidence, the Court concludes that the Government is likely to succeed on the merits by showing that Envigo has failed to keep beagles at its Cumberland facility safe and is in violation of 9 C.F.R. § 2.131(b) and § 3.7.

4. Failure to Provide Safe and Sanitary Conditions

The Government's evidence also shows that Envigo has failed to fulfill its obligation to provide safe and sanitary living conditions for the beagles it houses.

A. *Cleaning, Sanitation, and Pest Control*

Minimum sanitation requirements are set forth in 9 C.F.R. § 3.11. Beginning with an animal's primary enclosure, the regulations provide that feces and food waste must be removed from the interior of enclosures daily, and from beneath enclosures as often as necessary to prevent soiling the dogs inside and to reduce risk of disease, attracting pests and insects, and creating odor. *Id.* § 3.11(a).

Used enclosures, as well as food and water receptacles, must be sanitized at least once every 2 weeks using prescribed methods. *Id.* § 3.11(b)(2). Surrounding buildings and grounds must be in good repair and free of trash and junk to protect dogs from injury. *Id.* § 3.11(c). And facilities must establish and maintain an effective program of pest control. *Id.* § 3.11(d).

In July 2021, inspectors observed a buildup of "brown organic material" inside enclosures housing nursing beagles and their puppies. Dkt. 2-3 p. 10. The facilities manager admitted to inspectors that enclosures are disinfected only between liters or every six weeks. *Id.* Inspectors also noted that "[a]round the entire facility are large populations [of] live insects including house flies, drain flies, water bugs, cockroaches, and spiders with cobwebs." *Id.* 9. Despite being directed to correct these issues, *id.* 9, 12, the October 2021 inspection revealed "accumulations of waste and an overpowering fecal odor" emanating from beneath a large percentage of enclosures, Dkt. 2-4 p. 11. The November 2021 inspection likewise found that Envigo had failed to clean waste under the beagles' enclosures with sufficient frequency to prevent accumulation of filth. Dkt. 2-5 p. 16. In some instances, moldy food and excreta was allowed to pile several inches high. *Id*. Predictably, the inspectors also observed infestations of

insects, including large numbers of flies and maggots, in and around enclosures and in food receptacles. *Id.* 17. When investigators returned to execute the May 18, 2022, warrant, they observed bugs "present in many of the enclosures in this building." Taylor Decl. ¶ 8. They also observed mold and buildup of old food around the feeder. *Id.* ¶ 19.

B. *Primary Enclosure Design Requirements*

Envigo also had an obligation to construct its primary enclosures in such a way as to safely contain the beagles and protect them from other animals. 9 C.F.R. § 3.6(a)(2). Specific requirements include floors that protect dogs' feet and legs—e.g., floors that "do not allow the dogs' … feet to pass through any openings in the floor." *Id.* § 3.6(a)(2)(x). Each primary enclosure must also provide a "minimum amount of floor space" in accordance with a statutory formula. *Id.* § 3.6(c)(1)(i). Additional floor space must be provided for a mother with nursing puppies. *Id.* § 3.6(c)(1)(ii).

As previously mentioned, Envigo's enclosures contain gaps that allow beagles to attack one another from adjacent enclosures. The July 2021 inspection showed that 71 beagles were harmed in this way. Dkt. 2-3 at p. 7. Despite instruction to address this problem, *id.* 8, mortality records[11] reviewed during the next inspection revealed that nine beagles were injured in the same manner between August 2021 and October 2021, Dkt. 2-4 p. 8. When inspectors returned in November 2021, they again noted "numerous examples of body parts being pulled into adjacent enclosures by neighboring dogs causing injuries to the dogs involved." Dkt. 2-5 p. 12. Envigo was once again directed to address the issue. *Id.* But in March 2022, inspectors found major gabs

---

[11] Envigo appears to have had a practice of euthanizing beagles that sustained even a minor injury. Compl. ¶¶ 75–77; Dkt. 2-3 p. 6; Hollingsworth Decl. ¶ 5.

in the fencing, including at least one that would have permitted beagles to pass easily between enclosures. Dkt. 2-6 p. 3.

The enclosures were also unsafe for occupants, and especially for puppies. July 2021 inspectors observed over 200 puppies housed in enclosures with gaps in the flooring that were large enough for the puppies' feet to fall through up to their shoulders. Dkt. 2-2 pp. 9–10. Inspectors observed one adult beagle with her front left paw caught in the flooring. *Id.* 10. Employees could not say how long the dog had been trapped. *Id*. Despite being directed to correct the issue, *id*., inspectors observed the same problem during the October 2021 inspection. During the November 2021 inspection, inspectors determined that approximately 75% of enclosures had gaps as much as two inches wide between the flooring and fencing of enclosures, along with other issues.[12] Dkt. 2-5 pp. 7–8. Inspectors observed six beagles actively stuck in the flooring. *Id*. 12. Upon their return in March 2022, inspectors found 130 enclosures with gaps large enough for a beagles' foot or leg to pass through. Dkt. 2-6 p. 3. They also observed two beagles stuck in the flooring, and medical records indicated that at least 12 additional dogs had been injured in the same way since the last inspection. *Id.* 4.

Investigators executing the May 18, 2022, search warrant found one "beagle with its jaw stuck within" the welded bars used for the enclosure walls. Taylor Decl. ¶ 10. They observed "widespread problems with the flooring in the enclosures," including several which moved up and down with the animals. *Id*. ¶ 11. Investigators also "repeatedly observed" beagles who were trapped in the flooring of their enclosures. *Id*. ¶ 12.

---

[12] *See* Dkt. 2-5 p. 9 ("noting that in some enclosures, "the floors bounce up and down, shift, tilt, or sink under the weight of the dogs as they move about the enclosure.").

Envigo fairs no better with respect to floor space. In July 2021, inspectors observed 62 nursing mother beagles with a total of 393 puppies that were not provided the minimum required floor space. Dkt. 2-2 p. 11. And in November 2021, inspectors concluded that 742 beagles and weaned puppies lacked the minimum required space. Dkt. 2-5 pp. 13–14.

Based on the foregoing evidence, the Court concludes that the Government is likely to succeed on the merits by showing that Envigo has failed to provide beagles at its Cumberland facility safe and sanitary living conditions and safely designed enclosures, in violation of 9 C.F.R. § 3.11 and § 3.6.

### Irreparable Harm

To secure a preliminary injunction or temporary restraining order, the movant must further establish that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.[13] Irreparable harm is that which is "actual and imminent," not "remote or speculative." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (internal quotation marks omitted). "Generally, irreparable harm is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (internal quotation marks omitted); *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 517 (E.D. Va. 2021) (quoting *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018))

---

[13] The Court notes that some courts have held that because the AWA provides for a TRO or injunction upon satisfaction of the statutory standard, the traditional, four-part showing for an injunction including irreparable harm need not be satisfied. *See United States v. Gingerich*, No. 4:21-cv-283, 2021 WL 6144690, at *2 (S.D. Iowa Sept. 28, 2021). The Court has determined that the Government has satisfied the AWA's statutory requirements for injunctive relief, *see* 7 U.S.C. § 2146(c), as well as the four-part test, so the Court need not consider whether a temporary restraining order or injunction might in some other case issue absent irreparable harm. *See Lowe*, 2021 WL 149838, at *13–14.

(same). However, the "possibility that adequate compensatory or other corrective relief will be available at a later date … weighs heavily against a claim of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Rule 65(b) further states that a temporary restraining order without notice may only issue if the movant sets forth "specific facts in an affidavit or a verified complaint" that "clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A).

The Court concludes that the Government has put forward a clear showing of irreparable harm if the temporary restraining order did not issue, and clearly shown with specific facts in affidavits (and other supporting evidence) that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition. *See Winter*, 555 U.S. at 20; *see also* Fed. R. Civ. P. 65(b)(1)(A).

As described above, the Court finds the Government has clearly demonstrated that irreparable harm will result absent injunctive relief. Specifically, Envigo has been operating and continues to operate in a manner that flagrantly disregards numerous health protocols, placing the health of animals in serious danger and risk of death. *See* 7 U.S.C. § 2146(c). USDA inspection records documented dozens of instances in which dogs were euthanized rather than provided medical care when they had an injury, no matter how substantial or minor. *E.g.*, Dkt. 2-3 p. 6; Hollingsworth Decl. ¶ 5.

Indeed, while USDA agents and other law enforcement officers have seized 145 of beagles at the Cumberland facility that were at the most acute and immediate risk to their health, Moffitt Decl. ¶ 8, many more beagles still face inadequate food and water, veterinary care, and the other torturous conditions described, Hollingsworth Decl. ¶ 6. The grave health risks to the

beagles remaining in Envigo's care remain—they are immediate and substantial. In fact, as recently as May 18, 2022, USDA's teams conducting field-exams at the Cumberland facility found "two deceased puppies found in enclosures with their respective nursing mothers and littermates." Moffitt Decl. ¶ 7. An investigator found one beagle with its "jaw stuck within the welded bars" of its enclosure, *id.* ¶ 10; and had to assist six different beagles whose feet had gotten stuck in the flooring, *id.* ¶ 12. In multiple enclosures, puppies were unable to access the spigots to get water on their own, and when the investigator "held down the spigot to release water," the puppies "immediately rushed to the spigot to get water, and drank heavily and quickly." *Id.* ¶ 18. Simply put, the Court will not be able to unwind or in any way remedy the physical harm done to these dogs at the end of this case if the Court does not grant the requested immediate relief.

The Court finds irreparable harm clearly shown and the AWA's statutory provisions authorizing injunctive relief satisfied. *See, e.g.*, *Lowe*, 2021 WL 149838, at *14 (explaining that "the health and safety of the animals remaining in Defendants['] care continues to be at risk of irreparable harm absent injunctive relief").

**Balance of Equities and Public Interest**

The last two *Winter* factors are whether the balance of the equities tips in the plaintiff's favor, and the public interest is furthered by issuing the temporary restraining order. *See Winter*, 555 U.S. at 20. The Court concludes that each factor supports issuing the temporary restraining order against Envigo.

Turning first to the balance of the equities (or hardships), the Court does not discount that hiring sufficient staff, providing suitable enclosures and adequate veterinary care would impose costs on Envigo. It very well could be difficult to find and afford sufficient staff. However, any

expense required to fulfill those obligations was voluntary taken by Envigo when it applied for and received a license by the USDA to raise animals intended for research facilities, namely that it would comply with the AWA and applicable regulations. For its part, the Government has a strong interest in ensuring compliance with federal law and regulations to safeguard humane treatment of animals, as well as to ensure the efficacy of USDA's inspection and licensing regime. In addition, as the Government argues, "it is always in the public interest for citizens to follow the law and not financially profit from their law-breaking endeavors." Dkt. 2-1 p. 16. Especially considering the tailored nature of the relief sought by the Government, the Court concludes that any incremental added expense or other hardship faced by Envigo as necessary to comply with governing regulations is significantly outweighed by the equities that weigh in the Government's favor.

The Court concludes that the public interest would be supported by issuing the temporary restraining order. *See Winter*, 555 U.S. at 20. The public interest "may be declared in the form of a statute," and "[a] federal statute prohibiting the threatened acts that are the subject matter of the litigation has been considered a strong factor in favor of granting a preliminary injunction." Charles Alan Wright & Arthur R. Miller, 11A Fed. Prac. & Proc. Civ. § 2948.4 (3d ed.). Here, issuing the temporary restraining order would give effect to Congress's purpose in enacting the AWA, to ensure that "animals intended for use in research facilities … are provided humane care and treatment." 7 U.S.C. § 2131(1); *PETA*, 861 F.3d at 508 ("Congress passed the AWA in 1966 to regulate the research, exhibition, and sale of animals, as well as to assure their humane treatment."). Moreover, the Court agrees that injunctive relief is further supported against a regulated entity when a regulatory agency has issued it repeated warnings of its non-compliance, which have been ignored or insufficiently remedied. *See* Dkt. 2-1 p. 16.

Lastly, in addition to the Government's clear demonstration that all of the *Winter* factors weigh in support of the Court issuing a temporary restraining order, and further that the statutory requirements of the AWA have been satisfied for imposition of injunctive relief, the Court also finds that the Government has also satisfied Rule 65(b)(1)'s requirements for issuing a temporary restraining order without notice. As described above, the Government has provided "specific facts" in affidavits and other evidence that "clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party could be heard in opposition." *See id.*; *see supra*, Irreparable Harm. The Court further credits and finds persuasive the reasons cited by the Government attorney for why prior notice to Envigo should not be required before the Court issues the temporary restraining order, noting particularly Envigo's repeated non-compliance with inspectors' violation reports and with the AWA, as well as the substantial, documented risk of irreparable harm in the absence of prompt injunctive relief. *See* Fed. R. Civ. P. 65(b)(1)(B); Hollingsworth Decl. ¶¶ 6–8. Moreover, the record is replete with instances of Envigo's failure to comply with AWA's documentation and recordkeeping requirements, and harm or injury to beagles that is severe and ongoing, not properly documented. Hollingsworth Decl. ¶ 7 (and supporting documents). The Court finds that prior notice and the resulting delay before the Court imposes the tailored, interim measures requested by the Government, would risk jeopardizing the ability to effectively enforce the AWA and protect the health of the beagles still in Envigo's care.

## Conclusion

For the reasons discussed above, the Court has concluded that the Government has made a clear showing that the requested ex parte temporary restraining order should issue. Therefore, the Government's motion for a temporary restraining order will be and hereby is **GRANTED**.

*See* Dkt. 2. Defendant Envigo and its agents, servants, employees, and anyone who works in active concert with Envigo shall be **ORDERED** to comply with the following:

I.      Within **twenty-four (24) hours** of this Order, Envigo is **ORDERED** to

    1.  Comply with the requirement in 9 C.F.R. § 3.7 that only compatible dogs are housed together in an enclosure.

II.     Within **forty-eight (48) hours** of this Order, Envigo is **ORDERED** to

    2.  Provide to counsel for the United States the name and contact information for the attending veterinarian at the Cumberland Facility and a program of veterinary care that complies with 9 C.F.R. § 3.13.

    3.  Ensure that every puppy who is no longer housed in the same enclosure with their nursing mother is provided access to potable water from a water receptacle that the puppy can easily drink from without any assistance.

    4.  Ensure that every beagle is provided uncontaminated, wholesome, palatable food of sufficient quantity and nutritive value to maintain the normal condition and weight of the animal. The diet must be appropriate for the individual animal's age and condition. Envigo must feed each beagle at least once a day. Envigo must seek consent of counsel for the United States or, if counsel does not consent, a court order to feed any animal less than once a day. *See* 9 C.F.R. § 3.9.

III.    Within **seven (7) days** of this Order, Envigo is **ORDERED** to

    5.  Provide to counsel for the United States an inventory of every dog and puppy at the Cumberland Facility. The inventory must list each beagle individually with its sex, age, unique identification number, and enclosure location and number.

IV.    Within **fourteen (14) days** of this Order, Envigo is **ORDERED** to

    6.  Add to each enclosure enough food receptacles so that every weaned puppy and dog in the enclosure can access food at the same time. *See* 9 C.F.R. § 3.9(b).

    7.  Comply with the requirement for flooring provided in 9 C.F.R. § 3.6(a)(2)(x).

    8.  Install solid partitions between all adjacent enclosures. *See* 9 C.F.R. § 3.1(a).

**V.**     Envigo is further **ORDERED** to

9.  Provide veterinary treatment by a licensed veterinarian, within **ten (10) days** of receiving field examination forms from the United States, in accordance with the recommendations set forth on the forms.

10. Provide to counsel for the United States medical records for any veterinary care provided to any dog or puppy at the Cumberland Facility within **seventy-two (72) hours** of the animal receiving care or treatment. All medical records must comply with 9 C.F.R. § 3.13(b), and must include:

     a.  the unique identification number, identifying marks, sex, and age of the dog;
     b.  if a problem is identified (such as a disease, injury, or illness), the date and a description of the problem, examination findings, test results, plan for treatment and care, and treatment procedures performed, when appropriate;
     c.  the names of all vaccines and treatments administered and the dates of administration;
     d.  the dates and findings/results of all screening, routine, or other required or recommended test or examination.

11. Provide notice to counsel for the United States within **seventy-two (72) hours** of any dog or puppy found having injuries attributable to or consistent with a fight, as well as wounds of an unknown cause, including lacerations to ears and tail injuries.

12. Have a licensed veterinarian document the death of any dog or puppy and timely perform a necropsy.

13. Provide notice and a copy of the necropsy report to counsel for the United States within **seventy-two (72) hours** of receiving the necropsy report from the veterinarian.

14. Immediately cease disposing of any beagle at the Cumberland Facility by transferring from the Cumberland Facility or euthanizing any beagle at the Cumberland Facility without the consent of counsel for the United States or, if they do not consent, a court order. Any euthanasia must be performed by a licensed veterinarian or a licensed veterinary technician who is acting under the direct supervision of a licensed veterinarian.

15. Immediately cease breeding, selling, or otherwise dealing in beagles at the Cumberland Facility, until in full compliance with this order.

16. Provide notice to counsel for the United States within **seventy-two (72) hours** of the birth of any puppies, including the number of puppies born, the unique identification number of the dam, and the sex and unique identification numbers assigned to the puppies.

17. Permit unencumbered access to the Cumberland Facility by the United States, its agents and any contractor assisting the United States to check for compliance with this Order.

This Order shall be in effect for **fourteen (14) days** from the date of its issuance. Fed. R. Civ. P. 65(b)(2). No bond shall be required. Fed. R. Civ. P. 65(c).

It is further **ORDERED** that counsel for the United States shall serve a copy of this Order on Envigo forthwith.

The Clerk of the Court is directed to schedule a hearing on this temporary restraining order, as well as any motion thereon or other request for preliminary injunctive relief, on or about **ten (10) days** from the issuance of this Order. *See* Fed. R. Civ. P. 65(b)(3).

It is so **ORDERED**.

The Clerk of Court is directed to send a copy of this order to all counsel of record.

Entered this 21st day of May, 2022, at ___6:18___ p.m.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE