CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
6/17/2022
JULIA C. DUDLEY, CLERK
BY: s/ A. Little
    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 6:22-cv-00028 |
| v. | MEMORANDUM OPINION |
| ENVIGO RMS, LLC, | JUDGE NORMAN K. MOON |
| *Defendant.* | |

Currently before the Court is the Government's motion for a preliminary injunction to enforce the terms of the Animal Welfare Act ("AWA") at Defendant's breeding facility in Cumberland, Virginia. The motion is all but uncontested. Defendant has decided to close its Cumberland facility and is willing, in the interim, to submit to a court order designed to ensure that it complies with its obligations under the AWA. The only outstanding question is whether Defendant should be prevented from fulfilling existing contracts while winding-down its Cumberland operations.

While extraordinary relief is warranted to address Defendant's failure to meet its obligations under the AWA and to protect the animals at the Cumberland facility from further harm, equitable considerations do not justify an order that would prevent Defendant from fulfilling its existing contracts. Accordingly, a preliminary injunction will issue, and it will include each item of relief requested by the Government, except that Defendant will be permitted to fulfill its existing contracts.

## I. Background

On May 19, 2022, the Government filed a complaint and motion requesting an *ex parte* temporary restraining order ("TRO") directed against Defendant, a company that breeds and sells animals for use in scientific research. Dkt. 1. Concluding from the Government's evidence that Defendant's Cumberland facility was in serious and ongoing violation of the AWA, and that immediate relief was necessary to prevent irreparable injury, the Court issued the TRO two days later. *See* Dkt. 6. The Court subsequently extended the restraining order following a joint motion from the parties, in which they expressed their agreement that such extension would aid to facilitate ongoing settlement negotiations. *See* Dkt. 12 p. 2; Dkt. 13.

Negotiations were apparently successful on all but a single point: whether Defendant should be prohibited from transferring animals out of the facility to fulfill existing contracts. *Compare* Dkt. 17 p. 3 ¶¶ 11, 12 *with* Dkt. 18 p. 1, At the hearing on the instant motion, the Government argued that Defendant should not be allowed to engage in licensed activity—the sale of research animals—while in arrears of the terms of their license, which requires compliance with the AWA. *See* Hr. Tr. 25:5–13. Defendant responded that, in light of its acquiescence to every other term of the Government's proposed injunction, this additional term serves no valid equitable purpose. *See id*. 25:23–26:12; 91:13–19. *See also* Dkt. 18 pp. 5–6 (arguing that "allowing Envigo to fulfill existing orders" would allow removal of "more than 500 dogs . . . within the next 30 days" and would "minimize the immediate and long-lasting impact on ongoing and important pharmaceutical research").

## II. Legal Standard

Federal district courts are vested with inherent equitable power to enjoin imminent or ongoing violations of the law. That power was reaffirmed in the text of the AWA, which provides that "[t]he United States district courts . . . are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of" the AWA. 7 U.S.C. § 2146(c).

A plaintiff seeking a preliminary injunction must establish (1) "that he is likely to succeed on the merits," (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that the injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). But this is only the first step. Once it has been concluded that an injunction should issue, the court must determine its scope.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int.'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017). Interim equitable relief must be designed to minimize and balance concrete burdens on both parties, as well as consequences to the public, while also paying heed to the fact that the rights of neither party are conclusively determined until a final judgment has been entered. *Id*. See also *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020) (noting the obligation of district courts to design a preliminary injunction that is "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs") (quoting *Madsen v. Women's Health Ctr, Inc.*, 512 U.S. 753, 765 (1994)). If a court finds that the balance of equities is struck in some manner other than that proposed by the moving party, it "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Int.'l Refugee Assistance Project*,

137 S. Ct. at 2087 (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013)).

### III. Analysis

The Government has met its burden under *Winter*. Overwhelming evidence of Defendant's AWA violations, and of the irreparable harm that would result without intervention by the Court, was detailed in the Court's order date May 21, 2022. S*ee* Dkt. 6 pp. 5–19. But the Government has since supplemented its evidence with affidavits showing that Defendant remains in violation of the AWA as of June 8. *See e.g.*, Dkt. 17-4 ¶ 32 (observing inadequate provision of veterinary care in violation of 9 C.F.R. § 3.13(a)(2)–(3); 2.40(a), (b)(2)–(3)); ¶¶ 35–36 (observing failure to provide uncontaminated, wholesome, and palatable food in violation of 9 C.F.R. § 3.9(a)); ¶ 25 (observing failure to make potable water continuously available in violation of 9 C.F.R. § 3.10(a)); ¶ 33 (observing failure to meet minimum standards for handling in violation of 9 C.F.R. § 3.7); ¶ 24 (observing overcrowded conditions in violation of 9 C.F.R. § 3.6(c)(1)(i)); ¶¶ 28 (observing unsanitary enclosures in violation of 9 C.F.R § 3.6(a)(2)(v)). While Defendant offered some push-back on parts of the Government's evidence at the hearing on this motion, it did not attempt anything like a systematic refutation. To the contrary, the Defendant's own Chief Strategy Officer testified that he "can't argue with a USDA inspection report that identifies areas that are identified to be out of compliance." Hr. Tr. 70:10–12.

The Government has also met its burden, without challenge from Defendant, to show that the balance of equities and the public interest support the issuance of an injunction. As the Court stated in its previous order, *see* Dkt. 6 pp. 19–20, the costs associated with bringing the Cumberland facility into compliance with the AWA were accepted by Defendant when it applied for a license to breed and sell research animals and are outweighed by the Government's interest

in enforcing federal law. The public interest, moreover, as declared in the form of the AWA, supports protecting animals from inhumane treatment. *See id*. p. 20.

Therefore, an injunction will issue. However, the balance of equities, including the concrete burdens to the Government and Defendant, as well as the overall public interest, do not support extending the injunction to prevent Defendant from fulfilling its existing contracts.

Boiled down, the Government's argument is that Defendant should be deprived of any financial benefit "of continuing to engage in regulated activity without meeting these bare minimum standards set by the [AWA]." Hr. Tr. 5:14–16. The force of the Government's logic is undeniable. But any equitable purpose that might be served by the imposition of financial consequences—that is, financial consequences unconnected to the costs associated with bringing the Cumberland facility into compliance with the AWA—are outweighed by other equitable considerations.

It must be emphasized that, at this juncture, the authority of the Court is limited to balancing the concrete burdens on both parties while preventing irreparable harms.[1] Critically, the contested provision of the Government's proposed injunction is the only one not clearly tailored to preventing further harm to the animals at the Cumberland facility. It stands to reason that for every animal that leaves the facility, whether it be by sale or adoption, there is one fewer animal that can be harmed by the facility's AWA violations. Nor has the Government offered any reason to believe that allowing these sales to go forward would impose any concrete burdens upon it.

---

[1] Other authorities are not limited to equitable considerations. 7 U.S.C. § 2149 sets for the procedure by which the Secretary of Agriculture may suspend or revoke the license of any dealer he or she suspects of violating the AWA. But the Government has chosen to forego this route in favor of a "more tailored approach." *See* Hr. Tr. 88:3–18.

On the other hand, there is good reason to think that the public interest would be better served by allowing Defendant to fulfill its contracts. Defendant's expert testified that its research animals are "exceedingly important to domestic pharmaceutical discovery and development" and that the Cumberland facility in particular "has historically produced up to 25 percent of the domestic supply of beagles for research." Hr. Tr. 63:1–4. The expert also noted that the existing supply of research animals is insufficient to meet the current needs of research institutions. *Id*. 5–7.

To be clear, Defendant is not being given a free pass. Punitive consequences, including financial consequences, may follow from this litigation after a final judgment on the merits. *See e.g.*, 7 U.S.C. § 2149(b) (authorizing civil penalty of $10,000 per violation, explicitly providing that "[e]ach violation and each day during which a violation continues shall be a separate offense"). But interim equitable relief is not a vehicle for punishment.

\* \* \* \*

Defendant does not challenge the Government's requested injunction in any other respect. *See* Dkt. 18 p. 1. Accordingly, the motion for a preliminary injunction, Dkt. 17, will be GRANTED in part and DENIED in part. Defendant and its agents, servants, employees, and anyone who works in active concert with Defendant shall be ORDERED to comply with the following:

1. Within 24 hours of the Court's Order, ensure that potable water is continuously available to all beagles at the Cumberland facility, consistent with 9 C.F.R. § 3.10(a).

2. Within 7 days of this Order, ensure that each dog and puppy is provided the minimum amount of floor space consistent with 9 C.F.R. § 3.6(c)(1)(i) and every nursing dog is provided the minimum amount of floor space consistent with 9 C.F.R. 3.6(c)(1)(ii).

3. Within 7 days of this Order and thereafter, ensure that every primary enclosure housing beagles is free of excessive rust, jagged edges, sharp points, and is otherwise maintained consistent with 9 C.F.R. § 3.1(a), (c)(1).

4. Within 7days of this Order and thereafter, ensure that every primary enclosure housing beagles is maintained, cleaned, and sanitized consistent with 9 C.F.R. § 3.1(c)(3) and 3.11.

5. Within 7 days of this Order and thereafter, ensure that every primary enclosure housing beagles allows the beagles to remain dry and clean, consistent with 9 C.F.R. § 3.6(a)(2)(v).

6. Ensure that every beagle is provided uncontaminated, wholesome, palatable food of sufficient quantity and nutritive value to maintain the normal condition and weight of the animal. The diet must be appropriate for the individual animal's age and condition. Envigo must feed each beagle at least once a day. Envigo must seek consent of counsel for the United States or, if counsel does not consent, a court order to feed any animal less than once a day. *See* 9 C.F.R. § 3.9.

7. Provide adequate veterinary care to all dogs and puppies consistent with 9 C.F.R. § 2.40. Veterinary care, including dental work, shall be provided by a licensed veterinarian. For any veterinary care provided to any dog or puppy at the Cumberland Facility, provide medical records to counsel for the United States within 72 hours of the animal receiving care or treatment. All medical records must comply with 9 C.F.R. § 3.13(b), and must include:

    a. The unique identification number, identifying mark, sex, and age of the beagle;

    b. If a problem is identified (such as a disease, injury, or illness), the date and description of the problem, examination findings, test results, plan for treatment and care, and treatment procedures performed, when appropriate;

    c. The names of all vaccines and treatments administered and the dates of administration;

    d. The dates and findings/results of any screening, routine, or other required or recommended test or examination.

8. Provide notice to counsel for the United States within 72 hours of any dog or puppy found having injuries attributable to or consistent with a fight, as well as wounds of an unknown cause, including lacerations to ears and tail injuries.

9. Have a licensed veterinarian document the death of any dog or puppy and timely perform a necropsy.

10. Provide notice and a copy of the necropsy report to counsel for the United States within 72 hours of receiving the necropsy report from the veterinarian.

11. Immediately cease disposing of any beagle at the Cumberland facility by transferring from the Cumberland Facility or euthanizing any beagle at the Cumberland facility, except that Envigo may transfer animals to fulfill existing contracts. For purposes of this Order, "existing contracts" is defined to include only contracts (1) executed prior to the date the Court's TRO was issued (May 21, 2022) and (2) for animals bred in the Cumberland facility. No transfer pursuant to an existing contract may take place unless first reviewed for authenticity and approved by counsel for the Government. Envigo is also required to seek consent of counsel for the United States or, if they do not consent, a court order to transfer other than pursuant to an existing contract or to euthanize any beagle at the Cumberland Facility. Any euthanasia must be performed by a licensed veterinarian or a licensed veterinary technician who is acting under the direct supervision of a licensed veterinarian.

12. Immediately cease breeding, selling, or otherwise dealing in beagles at the Cumberland Facility until in full compliance with the terms of this Order, except that Envigo may fulfill its existing contracts pursuant to the review process outlined above.

13. Provide notice to counsel for the United States within 72 hours of the birth of any puppies, including the number of puppies born, the unique identification number of the dam, and the sex and unique identification numbers assigned to the puppies.

14. Permit unencumbered access to the Cumberland Facility by the United States, its agents, and any contractor assisting the United States to check for compliance with this Order.

To better facilitate a speedy resolution, both parties will further be DIRECTED to confer and inform the Court, by 5:00 p.m. on Wednesday June 22, 2022, of their plan for transferring all remaining animals out of the Cumberland facility.

The Clerk of the Court is directed to send a copy of this memorandum opinion to all counsel of record.

– 9 –

Entered this 17th day of June 2022.

                                             /s/ Norman K. Moon
                                             NORMAN K. MOON
                                             SENIOR UNITED STATES DISTRICT JUDGE